AMERICAN TISSUE, INC., a Chapter 11 bankruptcy debtor-in-possession, Plaintiff,

v.

DONALDSON, LUFKIN & JENRETTE SECURITIES CORPORATION; DLJ Merchant Banking Partners, II, L.P.; DLJMB Funding II, Inc.; DLJ Merchant Banking Partners II–A, L.P.; DLJ First ESC L.P.; DLJ Offshore Partners II, C.V. DLJ EAB Partners,

L.P.; DLJ ESC II L.P.; DLJ Diversi-
fied Partners, L.P.; DLJ Diversified
Partners–A, L.P.; DLJ Millennium
Partners, L.P.; DLJ Millennium Part-
ners–A, L.P.; and Andrew Rush, De-
fendants.

No. 03 Civ. 6913(GEL).

United States District Court,
S.D. New York.

Aug. 10, 2004.

vestment bank and financial consultant Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") and several affiliates, alleging various causes of action for fraud, breach of contract and fiduciary duty, and malpractice.[1] DLJ moves to dismiss for failure to state a claim and lack of subject matter jurisdiction pursuant to Rules 12(b)(6) and 9(b), and 12(b)(1), respectively, of the Federal Rules of Civil Procedure. The Court heard oral argument on May 7, 2004. For the reasons that follow, the motion will be granted in part and denied in part.

Charles H. Lichtman, Berger Singerman, Fort Lauderdale, FL (Jeffrey Schreiber, Meister Seelig & Fein LLP, New York City, on the brief), for Plaintiff.

Bradley J. Butwin, O'Melveny & Myers LLP, New York City (Robert White, Michael C. Keats, on the brief), for Defendants.

## OPINION AND ORDER

LYNCH, District Judge.

American Tissue, Inc. ("ATI"), a Chapter 11 bankruptcy debtor-in-possession, brings this action against its former in-

## BACKGROUND

The facts set forth below, drawn from the complaint, must be taken as true for purposes of DLJ's motion to dismiss for failure to state a claim.[2] *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). ATI's predecessor, American Tissue Holdings, Inc. ("Holdings"), manufactured, distributed, and sold consumer paper products nationwide. (Compl.¶ 19.) In November 1998, Holdings sought to acquire certain companies from an entity known as Crown Paper Co. ("Crown") and simultaneously to refinance its debt. (*Id.*) ATI asked DLJ to act as its investment

---

1. ATI refers to defendants collectively as "DLJ." With the exception of Andrew Rush, an officer and employee of the principal defendant, Donaldson, Lufkin & Jenrette Securities Corporation ("DLJSC") (Compl.¶ 14), ATI names the remaining defendants, affiliates of DLJSC, only as investors in certain loans made to ATI and related entities. (*Id.* ¶¶ 3–13.) For convenience and consistency with the complaint, the Court will refer generally to defendants as "DLJ." The Court notes, however, that defendants object to this convention because it conflates a number of distinct entities. As the defendants emphasize in their brief, only DLJSC executed certain of the governing letter agreements at issue, while the other DLJ entities were only parties to various loans and financial arrangements, and Andrew Rush appears in this action only

in his capacity as a representative of certain of these defendant entities. (D.Br.6.) Where relevant to the analysis, defendants shall be distinguished accordingly.

2. Insofar as DLJ moves to dismiss for lack of subject matter jurisdiction, the Court may refer to extrinsic evidence relevant to the sufficiency of ATI's jurisdictional allegations. *See Robinson v. Gov't of Malaysia,* 269 F.3d 133, 140 (2d Cir.2001). But the facts set forth below, which will be analyzed in connection with DLJ's motion to dismiss for failure to state a claim, derive only from the complaint and documents referenced by, incorporated in, or relied upon in drafting it. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 & n. 3 (2d Cir.2002).

banker and consultant in connection with these related transactions, and on March 1, 1999, the parties executed a contract for this purpose, the "Engagement Letter."[3] (*Id.* ¶¶ 20–21.)

By its terms, DLJ agreed to act as either

(i) sole initial purchaser to Holdings for a period of twelve months, ... in connection with a private placement of taxable Senior Secured Notes ... or (ii) sole managing underwriter in connection with a contemplated underwritten public offering registered under the [Securities] Act [of 1933] (a "Public Offering") of Securities, in each case to refinance outstanding indebtedness of Holdings and to acquire substantially all of the Berlin and Gorham, New Hampshire assets of Crown Paper Co. (the "Berlin–Gorham Mill"), on terms satisfactory to Holdings.

(Keats Decl, Ex. 1 at 1; Compl. ¶ 21.) DLJ also agreed to use its reasonable best efforts to assist Holdings to prepare its offering memorandum, structure its acquisition of Crown, and organize its marketing efforts. (Keats Decl., Ex. 1 at 1; Compl. ¶ 22.) In exchange, Holdings agreed to give DLJ a 2.75% underwriter's discount and a $200,000 fee. (Keats Decl. Ex. 1 at 1; Compl. ¶ 23.) Finally, by the Engagement Letter, Holdings "acknowledge[d] that DLJ's current estimate is that the financing would bear an interest rate of approximately 11.5%, but that the actual cost of capital may vary based on changing market conditions in both the high yield and U.S. Treasury markets, a changing view of Holdings' credit standing, the value of the Berlin–Gorham Mill or such other matters as may impact the cost of capital and marketability of the Securities." (Keats Decl., Ex. 1 at 3.)

ATI alleges, however, that notwithstanding this caveat, DLJ expressly assured Holdings, presumably by oral representa-

**3.** The complaint represents that "[a] copy of the Engagement Letter is attached ... as Exhibit B." (Compl.¶ 21.) Exhibit B, on its face, does not purport to be the Engagement Letter, but rather a letter to ATI from lawyers writing on behalf of DLJ intended "to summarize certain of [DLJ's] concerns with respect to the proposed engagement letter." (Compl., Ex. B. at 1.) In support of its motion to dismiss, DLJ offers a copy of what it contends is the Engagement Letter itself (Keats Decl., Ex. 1), and the terms of this document conform to the complaint's allegations about the Engagement Letter. Nevertheless, at oral argument, ATI denied that DLJ's proffered document is the Engagement Letter and represented that it would furnish chambers with a copy of the real Engagement Letter. (Tr. 29–33.) By letter dated May 11, 2004, ATI sent the Court two documents "in support of ATI's position with respect to there being different forms of the March 1, 1999 Engagement Letter," but not the Engagement Letter itself, which ATI's counsel represented that he had seen, but could not locate.

The Court may consider documents referred to by, and relied on in drafting, the complaint. *Chambers*, 282 F.3d at 152–53. DLJ provided the Court a copy of the Engagement Letter, which it represents under oath—albeit by means of the affidavit of an attorney who may lack first-hand knowledge—to be "a true and correct copy of the Engagement Letter." (Keats Decl. ¶ 2.) Except for the unsworn protestations of ATI's attorney, who insists that he "absolutely saw a separate version of the Engagement Letter," ATI offers no reason, still less evidence, to discredit DLJ's representation that the document attached to its motion is the actual Engagement Letter. Nor does ATI explain how, if at all, the purported "separate version" differs. ATI cannot create an issue of fact by explicitly referring to and relying upon a document in its complaint, without providing that document or its full text, and then, when defendants supply the missing document, objecting to it without any evidentiary basis. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991); *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 261 F.Supp.2d 188, 213 n. 29 (E.D.N.Y.2003).

tions, that (1) no changes to this estimate would be made, and (2) no additional equity infusion from either ATI's shareholders or third parties would be required. ATI also alleges that DLJ made these assurances fraudulently to induce ATI to retain DLJ, for ATI had made clear that were DLJ to insist upon an equity infusion as part of the financing, ATI would retain a different investment banker, such as Bear Stearns & Co., Inc. (Compl.¶ 24.)

On March 2, 2004, DLJ issued Holdings a "Highly Confident Letter," as contemplated by the Engagement Letter. (Keats Decl., Ex. 1 at 3; Compl. ¶ 25.) The Highly Confident Letter set forth DLJ's views about Holdings' ability to consummate the acquisition of Crown and refinance its debt.[4] (Keats Decl., Ex. 2 at 1.) In it, DLJ represented that based on the information supplied to it by Holdings and its analysis of market conditions, it felt "highly confident of [its] ability to sell the Securities to finance the purchase price of the Acquisition and effect the Refinancing [of Holdings' debt]," but cautioned that its prognosis remained subject to a variety of enumerated conditions. (Keats Decl., Ex. 3 at DLJ–0005 to DLJ–0006.)

The Highly Confident Letter also outlined the proposed structure of the acquisition and refinancing. Holdings, through a new wholly-owned subsidiary, would acquire Crown's assets and simultaneously refinance its existing debt, which totaled about $127 million, excluding a $26 million mortgage debt. (Id. at DLJ–0005; Compl. ¶ 26.) To accomplish this, Holdings would first transfer "about $20 million of unsecured related party debt (owed to a Holdings' principal, Nourallah Elghanayan) to a newly formed holding company" (Compl.¶ 27), which debt would be "subordinated to all existing and newly issued debt of Holdings and shall otherwise contain terms satisfactory to DLJ in all respects." (Keats Decl., Ex. 3 at DLJ–0005.) The acquisition of Crown's assets would cost $45 million, to be financed by the issuance of $175 million in bonds that would mature in 2009. (Id.; Compl. ¶ 27.) Furthermore, at the time of the acquisition, Holdings would "enter into a new $100 million revolving credit facility with LaSalle National Bank of Chicago." (Keats Decl., Ex. 3 at DLJ–0005; Compl. ¶ 27.)

On March 15, 1999, the same day DLJ updated the Highly Confident Letter, it also sent Holdings a letter, which ATI denominates the "Executive Termination Letter" (Compl.¶ 29, Ex. D), by which Holdings acknowledged that DLJ's ability to consummate the acquisition and debt refinancing depended, not only on the conditions enumerated in the Highly Confident Letter, but on the following additional condition:

> Holdings shall replace both the current chief financial officer and the current controller of Holdings with executives reasonably satisfactory to DLJ prior to the printing of the preliminary Offering Memorandum related to the Financing and the commencement of the roadshow for the Financing.

(Compl., Ex. D at 1; Keats Decl., Ex. 3 at DLJ–0010:) ATI alleges that DLJ thereby "injected itself" into Holdings' management for manipulative and fraudulent purposes that became clear subsequently. (Compl.¶¶ 29, 56.)

In the months leading up to July 1999, DLJ conducted due diligence in preparation for the acquisition of Crown's assets, and Holdings underwent a corporate restructuring as contemplated by the Highly Confident Letter. (Compl.¶ 31.) "[B]y

4. DLJ updated the Highly Confident Letter on March 15, 2004. (Keats Decl., Ex. 3.)

and at the insistence of DLJ," Holdings formed ATI to act as the holding company and successor entity in connection with the projected transactions. (*Id.*) To make the bond offering more attractive, DLJ also "required" Holdings to move the $21.7 million in debt owed to Elghanayan to another newly-created holding company, Super American Tissue, Inc. ("SATI"). (*Id.* ¶ 32.) Elghanayan and Mehdi Gabayzadeh, Holdings' other shareholder, each owned 50% of SATI, either directly or through trusts under their control. (*Id.*) SATI, in turn, wholly owned yet another new holding company, Middle American Tissue, Inc. ("MATI"), and MATI owned ATI. (*Id.*)

ATI alleges that DLJ forced Holdings to undergo this corporate restructuring to hide the $21.7 million debt to Elghanayan from prospective investors. (*Id.* ¶ 48.) ATI also alleges that DLJ created unrealistic financial projections for Crown, which Crown's management rejected "categorically," but which DLJ used anyway in an effort to make the contemplated bond offering more attractive. According to the complaint, ATI "had no knowledge of these facts as they were occurring and did not learn of them until after the filing of its petition for bankruptcy." (*Id.* ¶ 33.)

On July 2, 1999, one week before the scheduled closing of the transactions, DLJ advised ATI that "contrary to all prior representations made by DLJ, (a) $25 million in additional equity had to be infused into ATI to make the Transaction more appealing to third party investors, and (b) the Bond due date was being moved up and [the] interest rate increased by 1%." (*Id.* ¶ 35.) DLJ changed the terms of the

bond offering from $185 million at 11.5%, which ATI deemed "the necessary and appropriate sum of cash for its needs while still being attractive to investors," to $165 million at 12.5%, and moved up the bonds' maturation date by three years.[5] (*Id.* ¶ 36.) ATI alleges that DLJ knew from the inception of their business relationship that it would insist on these changes, but concealed this information from ATI to facilitate its own long-term plan to self-deal. (*Id.*)

Because of these eleventh-hour changes, ATI unexpectedly needed $25 million in equity, which it had to secure quickly. The complaint alleges that DLJ could, and did, thus "mandat[e]" (1) that MATI accept a $20 million loan from certain other DLJ entities, even though it knew that MATI, a holding company, would be unable to repay the loan, and (2) that either SATI or MATI contribute an additional $5 million to ATI, which Elghanayan provided by yet another loan. (*Id.* ¶ 37.) DLJ also placed conditions on the DLJ loan for its own benefit. First, it required MATI to issue it stock warrants equal to 10% of MATI's outstanding stock, which ATI was to repurchase from DLJ for $12 million within a year. Second, it required SATI and MATI to enter into a stockholders agreement with DLJ Merchant Banking Partners, "the funding source of the DLJ" loan of $20 million, and the other DLJ affiliates. By that agreement, DLJ and its affiliates further injected themselves into ATI's management and cemented their control over the company. (*Id.* ¶¶ 38–41.) DLJ used this control to ensure that it would receive "egregious sums commercially extorted as represented by the DLJ Loan and Warrants." (*Id.* ¶ 42.)

**5.** The complaint alleges that DLJ "had advised ATI that the Transaction bond offering terms would be set at raising $185 million, carrying an interest rate of 11.5%" (Compl.¶ 36), even though, elsewhere, it alleges that the parties contemplated raising $175 million (*id.* ¶ 27), the figure consistent with the terms of the Highly Confident Letter. (Keats Decl., Ex. 3 at DLJ–0005.)

According to ATI, "following DLJ's July 2, 1999 bombshell news, DLJ even admitted that it consciously lied to ATI representatives at the inception of the parties['] relationship and then throughout the road show for the Bond Offering in order to get the engagement." (*Id.* ¶ 44.) In particular, DLJ allegedly conceded that it always knew that ATI would need additional equity to make the bond offering work, but it concealed this knowledge from ATI until July 2, 1999, so that ATI would have no time to seek alternative financing, and thus no choice but to "accede to DLJ's demands," lest it go bankrupt for lack of adequate funding when the offering failed. (*Id.* ¶ 45.)

In retrospect, ATI realized that the corporate structure "formulated by DLJ . . . was the first domino in the proximate causal chain leading to the financial collapse of ATI." (*Id.* ¶ 48.) First, by advising ATI to hide its $20 million debt to Elghanayan, DLJ deceived investors. (*Id.*) Yet that debt "had to be repaid somehow," and DLJ allegedly engineered a mechanism by which it could profit from this circumstance. The complaint's oblique allegations make it difficult to understand precisely how this alleged self-dealing worked, but their gravamen seems to be that "DLJ acquiesced in SATI entering into capital equipment leases necessary for the operation of ATI and its subsidiaries, but with SATI then subleasing the equipment to ATI on grossly above market payment terms." (*Id.* ¶ 50.) Second, DLJ's failure to disclose that ATI would require $25 million in equity allegedly compelled ATI to accept a loan from DLJ on usurious terms, further undermining ATI's financial viability.

ATI summarizes its essential allegations as follows:

DLJ (a) intentionally established a corporate structure to hide insider loans from investors, (b) did so in order to assure the Transaction could close to earn its substantial fees, (c) manipulated itself into requiring [that] ATI enter into a disguised usurious loan, combined with (d) mandating that ATI provide Warrants in DLJ's favor [which DLJ] valued at $12 million, but which had no real value, (e) placed itself into a director/management position with an onerous shareholder agreement, and (f) approved an equipment lease scheme through the shell corporate structure it created, so that SATI or MATI could pay DLJ on the DLJ Loan and Warrants instead of servicing debt and paying creditors.

(*Id.* ¶ 56.) This conduct, ATI alleges, caused its bankruptcy and proximately damaged it in the amount of "at least $300 million, which damage consists of general damage and damage to good will, but more specifically, the liabilities ATI incurred to creditors of at least $300 million, and the transfer of substantial ATI assets to the non-debtor affiliates." (*Id.* ¶ 58.) ATI brings claims on this basis for professional malpractice, breach of contract, breach of fiduciary duty, fraud in the inducement, and fraudulent conveyances.

## DISCUSSION

### I. *Standard on a Motion to Dismiss*

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in his favor. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The Court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2

L.Ed.2d 80 (1957). Beyond the facts in the complaint, the Court may consider "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991); *Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985.) The Federal Rules of Civil Procedure generally require only notice pleading, but where, as here, the plaintiff alleges fraud, "the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b); *see Stern v. Gen. Elec. Co.*, 924 F.2d 472, 476 (2d Cir.1991) ("[A]llegations of fraud must be supported by particular statements indicating the factual circumstances on which the theory of fraud is based.").

## II. *The Malpractice Claims*

ATI's first three claims allege, respectively, professional malpractice, breach of contract, and breach of fiduciary duty. (Compl.¶¶ 60–92.) These claims, as DLJ correctly notes (D.Br.16–17), effectively allege one claim under three rubrics. Each asserts in essence that DLJ owed and breached a duty of care to ATI arising out of a contract or New York common law, or both. While these claims cannot be analyzed identically in all respects, and each, DLJ argues, suffers from discrete defects, they can be usefully categorized together for purposes of DLJ's two global objections to them, based on standing and the contract. (D.Br.2–3.) For convenience, the Court will therefore adopt DLJ's denomination of ATI's first three claims as "the malpractice claims" (*id.* 1), a practice that comports with that of other courts in this district in related and similar cases.[6]

### A. *Standing*

DLJ raises several threshold objections to the malpractice claims, including that ATI lacks standing because it alleges no harm to itself, as distinct from its creditors, and that "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.1991); *see also In re The Bennett Funding Group, Inc.*, 336 F.3d 94, 99–100 (2d Cir.2003). The first objection is constitutional: that ATI fails to allege an injury-in-fact sufficient to confer on it standing under Article III. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The second is based on *Wagoner*, which, DLJ argues, bars a debtor-in-possession, such as ATI, from bringing suit to recover for wrongs in which it participated. *Wight v. Bankamerica Corp.*, 219 F.3d 79, 86–87 (2d Cir.2000); *Am. Tissue, Inc. v. Arthur Andersen, L.L.P.*, 275 F.Supp.2d 398, 404

---

6. *Am. Tissue, Inc. v. Arthur Andersen, L.L.P.*, 275 F.Supp.2d 398, 405 n. 7 (S.D.N.Y.2003) ("Although ATI brings claims for malpractice, breach of contract, and breach of fiduciary duty, these three causes of action boil down to one claim for the provision of deficient accounting services."); *The Common Fund for Non–Profit Orgs. v. KPMG Peat Marwick LLP*, No. 96 Civ. 0255, 2000 WL 124819 (S.D.N.Y. Feb. 2, 2000) ("[A] breach of contract claim premised on a professional's failure to exercise due care or to abide by general professional standards is nothing but a redundant pleading of a malpractice claim."); *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld L.L.P.*, 212 B.R. 34, 39 (S.D.N.Y.1997) ("The Trustee's three causes of action—legal malpractice, breach of contract and breach of fiduciary duty—essentially amount to a single claim for the provision of deficient legal services."); *Wedtech Corp. v. KMG Main Hurdman (In re Wedtech Corp.)*, 81 B.R. 240, 241 (S.D.N.Y.1987) (observing that the debtor's allegations, "although brought under many different theories, all sound in malpractice," for they "allege what is essentially a single form of wrongdoing under different names") (internal quotation marks omitted).

n. 6 (S.D.N.Y.2003) (*Wagoner* rule applies equally to trustees and debtors-in-possession).

ATI's claims can charitably be characterized as convoluted and oblique, qualities further exacerbated by ATI's claims, in a separate action, against its controlling shareholders for alleged abuse of the corporate form, manipulation of corporate funds, and fraud. *See Am. Tissue*, 275 F.Supp.2d at 400–03 (detailing ATI's claims against Elghanayan and Gabayzadeh as set forth in an insider complaint filed on August 1, 2002). Nevertheless, here, as in *Wagoner*, it is analytically helpful to ask "what claims [ATI] possessed against [DLJ] *before* [ATI] went bankrupt." 944 F.2d at 119 (emphasis in original).[7] Leaving aside the proper legal characterization of ATI's various claims, *see In re Granite Partners, L.P.*, 194 B.R. 318, 325 (Bkrtcy.S.D.N.Y.1996) (standing inquiry should focus on "the nature of the wrongs alleged . . . without regard to the plaintiff's designation"), ATI seems to allege seven principal wrongs or sources of injury: that DLJ, *first*, advised ATI to create a certain corporate structure—ATI, SATI, and MATI—in connection with its acquisition of Crown's assets, bond offering, and debt refinancing; *second*, fraudulently assured ATI that the offering would require no equity infusion, for DLJ knew that if it insisted on this condition, ATI would retain another investment banker; *third*, changed the terms of the offering at the eleventh hour by requiring such an equity infusion, as well as by, *fourth*, moving up the due date of the bonds and increasing their interest rate by one percentage point; *fifth*, knowingly inserted false financial projections into the prospectus; *sixth*, by various machinations, injected itself into ATI's management to enable itself to self-deal; and *seventh*, "acquiesced in" "an equipment lease scheme" designed to ensure that ATI would pay DLJ for certain loans rather than "servicing debt and paying creditors." (Compl.¶¶ 50, 56.) These delicts damaged ATI in the amount of "$300 million, which damage consists of general damage and damage to good will, but more specifically, the liabilities ATI incurred to creditors of at least $300 million, and the transfer of substantial ATI assets to the non-debtor affiliates." (*Id.* ¶ 58.)

*Wagoner* provides a useful framework for the analysis of each of these alleged sources of injury. In *Wagoner*, the Second Circuit dismissed a bankruptcy trustee's claim that Shearson, the broker of HMK, the bankrupt corporation, had "engaged in conduct intended to strip HMK of its assets and to make unsuitable investments and to improperly invest trust funds of clients of HMK and of HMK." 944 F.2d at 119. The court held that, *first*, insofar as this claim alleged injury to HMK's clients, only the creditors, not the trustee, had Article III standing to assert it, *id.* at 119–20; and *second*, insofar as it could be construed to allege injury to HMK, the trustee nonetheless lacked standing to assert it, but on a different legal basis: that under New York law, "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Id.* at 120.[8] These two holdings, albeit related, rest on distinct grounds.

---

7. For convenience and consistency with the pleadings and briefs, the Court will refer to ATI, even though, at the time some of the events giving rise to this action took place, Holdings, ATI's predecessor, was the relevant entity.

8. The parties did not dispute "that HMK's sole stockholder and decisionmaker, Kirschner, not only knew of the bad investments, but actively forwarded them." *Wagoner*, 944 F.2d at 120.

Both potentially bear on ATI's alleged sources of injury enumerated above. To avoid confusion, the Court will refer, as do the parties and subsequent case law, only to the latter as "the *Wagoner* rule," *see, e.g., In re Bennett,* 336 F.3d at 100; *Wight,* 219 F.3d at 86–87; the former is properly understood as an application of well-settled principles of constitutional standing.

### 1. *Constitutional Standing*

 Because the absence of constitutional standing would divest the Court of subject matter jurisdiction, it must be addressed before analysis of the merits. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101–02, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). In *Lujan,* the Supreme Court characterized "three elements" as the "irreducible constitutional minimum of standing" under Article III, § 2, of the Constitution, 504 U.S. at 560, 112 S.Ct. 2130:(1) injury-in-fact, a harm that is concrete and either actual or imminent, not hypothetical or conjectural, *Steel Co.,* 523 U.S. at 103, 118 S.Ct. 1003; (2) causation, "a fairly traceable connection between the plaintiff's injury and the complained-of conduct," *id.*; and (3) redressability, "a likelihood that the requested relief will redress the alleged injury." *Id.*

DLJ principally challenges the existence of the first of these elements. It argues that the injuries and corresponding claims alleged by ATI accrue to ATI's creditors rather than to ATI. As to several of the sources of ATI's claims, the Court agrees. The remaining allegations, while obliquely pled, suffice to confer constitutional standing on ATI, although, as discussed below, several may run afoul of the *Wagoner* rule.

### a. *Damages*

At the threshold, the constitutional standing analysis is complicated by ATI's failure, with respect to the malpractice claims, to allege any damages other than $300 million owed to ATI's creditors. The complaint alleges that "ATI has been proximately damaged by [DLJ's] conduct to the approximate amount of at least $300 million, which damage consists of general damage and damage to good will, but more specifically, the liabilities ATI incurred to creditors of at least $300 million, and the transfer of substantial ATI assets to the non-debtor affiliates." (Compl.¶ 58.) Furthermore, as DLJ emphasizes (D. Reply Br. 4), ATI appears effectively to concede that the malpractice claims arise *solely* from injury to ATI's creditors; in its brief, ATI argues that it "has been proximately damaged by all of this conduct to the approximate amount of at least $300 million, which damage consists of general damage which followed the DLJ debacle that ultimately led ATI into bankruptcy, where it has creditors' claims of about $300 million." (P. Br.9.)

 Insofar as ATI seeks to recover money owed to creditors, it lacks standing. *See Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1093 (2d Cir.1995). ATI may, however, bring claims to recover for injuries *it* allegedly incurred—for example, fees that it paid to DLJ or interest on allegedly usurious loans extorted from ATI after DLJ changed the terms of the bond offering at the eleventh hour. Against the backdrop of extensive allegations of internal corruption and criminal conduct that led to ATI's suit against, among others, its former shareholders Gabayzadeh and Elghanayan, a federal grand jury indictment of, among others, SATI and Gabayzadeh, and an SEC complaint against, among others, ATI and Gabayzadeh (Keats Decl., Exs. 13–15), *see Am. Tissue,* 275 F.Supp.2d at 402–03, the Court must view with considerable skepticism ATI's allegations that DLJ's deficient financial advice and other breaches of contract or fiduciary

duty caused ATI to go bankrupt.[9] And it strains credulity that the damages alleged by ATI in connection with the malpractice claims—the $300 million owed by ATI to its creditors—happen to correspond precisely to the damages that ATI itself allegedly suffered as a consequence of DLJ's bad advice and self-dealing. (Tr. 20–21.) *Cf. Hirsch v. Arthur Andersen & Co.*, 178 B.R. 40, 43 (D.Conn.1994) ("Recognizing that he cannot assert claims against the defendants on behalf of the creditors, the trustee alleges damage to the debtors, to the extent of the unpaid obligations of the debtors to the creditors."), *aff'd, Hirsch*, 72 F.3d 1085.

Nevertheless, ATI's failure to plead damages properly (or plausibly) does not necessarily condemn its malpractice claims wholesale. However unlikely that DLJ's alleged breaches of fiduciary duty, fraud, and other malfeasance, as opposed to the alleged corrupt and even criminal conduct internal to ATI, caused ATI's bankruptcy, proximate causation generally remains an issue of fact for the jury. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840–41, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996) ("The issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review."). While it seems highly implausible that the damages ATI allegedly sustained because of DLJ's alleged malpractice correspond to the $300 million ATI owes to its creditors, the Court therefore declines to hold, solely on the basis of ATI's (at best) inartful pleading of its damages, that ATI lacks Article III standing to assert any of the malpractice claims. ATI can assert these claims insofar as the injuries it alleges (1) can be traced to DLJ and (2) injured ATI, as distinct from its creditors or investors.

ATI's malpractice allegations boil down to a claim that had DLJ done what it told ATI it could or would do, ATI would not have been effectively forced to enter into certain unfavorable financial arrangements that precipitated its demise. To the extent that ATI seeks to recover for injuries arising from those unfavorable financial arrangements, as well as fees or interest paid to DLJ, ATI has constitutional standing. But not all of the sources of injury enumerated above can be so characterized.

b. *Corporate Structure Advice*

■ First, ATI lacks standing to assert claims based on DLJ's alleged advice to ATI to create the three-tiered ATI/MATI/SATI corporate structure in connection with the Crown acquisition, bond offering, and debt refinancing. Assuming that DLJ, with fraudulent intent, advised ATI to establish this corporate structure, how did that advice injure ATI? The complaint offers two theories. Neither suffices to confer standing on ATI.

First, the complaint suggests that this corporate structure hid from investors $20 million in debt owed to Elghanayan, deceiving them about ATI's financial condition; in the complaint's words, DLJ "intentionally established a corporate structure to hide insider loans from investors."

9. ATI suggested in its brief (P. Br.9) and asserted at oral argument (Tr. 20) that DLJ's various delicts caused its bankruptcy. But the insider complaint filed by ATI alleges that it was the "action and inaction" of its former shareholders, Gabayzadeh and Elghanayan, who engaged in fraudulent transfers, misused their control of ATI, and breached their fiduciary duties to ATI and affiliated entities, that "caused the artificial perpetuation of [ATI's] existence past the point of insolvency." (Keats Decl., Ex. 13 at 3.) *See also Am. Tissue*, 275 F.Supp.2d at 402 (observing that "the essence of the Insider Complaint is that Gabayzadeh and Elghanayan 'participated in and allowed various financial improprieties to take place,'" "making bankruptcy a foregone conclusion") (quoting Insider Compl. ¶ 46).

(Compl.¶ 56.) In elaboration, the complaint avers that

> to make the Bond Offering attractive to investors, DLJ came up with the idea and required Holdings to eliminate insider debt recorded on its balance sheet. The debt was not really eliminated—it was merely moved to and hidden in the new corporation, SATI, which was used to shelter the ownership of MATI, and which owned ATI. Literally, DLJ's stated intent was to formulate a corporate structure with this off balance sheet transfer to hide Elghanayan's $20 million shareholder loan from Bond Offering investors.

(*Id.* ¶ 48.) By the complaint's own allegations, this injury clearly accrues to ATI's creditors, not to ATI, which cannot plausibly assert that its corporate structure concealed its debts from itself.[10] By adopting DLJ's alleged advice, that is, ATI did not deceive itself about its financial condition. On this theory, all claims arising from DLJ's recommendation that ATI adopt a certain corporate structure belong to investors or creditors.[11] ATI lacks standing to bring them because it did not suffer an injury. *See Wagoner,* 944 F.2d at 118 (noting that "[i]t is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself" and collecting cases); *see also Hirsch,* 72 F.3d at 1093 (applying Connecticut law).[12]

---

**10.** The ATI/SATI/MATI corporate structure, in itself, is neither unlawful nor even unusual; corporations commonly create holding companies for a variety of reasons. Only insofar as DLJ advised ATI to create this structure deliberately to hide ATI's corporate debt from investors does it become suspect. Even assuming DLJ advised ATI to create this structure with such a nefarious purpose in mind, that deception injured investors and creditors, not ATI, and hence, as explained in the text, ATI lacks constitutional standing to assert claims arising from DLJ's purported advice on how to structure the transaction. Furthermore, to the extent that ATI *knew* that the corporate structure DLJ recommended would effectively conceal the full amount of its debt from investors—and the complaint implicitly confirms that it did, even if it allegedly did not "understand" the effect that such concealment would have on the bond offering (Compl. ¶ 52; *see also id.* ¶ 48)—ATI participated in the very wrong for which it seeks to recover, and therefore, as explained in the following section, claims arising out of this purportedly derelict advice would be barred by the *Wagoner* rule even if ATI had constitutional standing to bring them. *See Wight,* 219 F.3d at 87 ("Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in.").

**11.** Throughout the complaint, ATI uses words like "required," "mandated," and "insisted" to describe DLJ's advice and actions. ATI's financial duress, which DLJ allegedly caused, may justify the use of such words for their rhetorical value, such as it may be. But the Court need not and does not accept the truth of factual allegations couched as legal conclusions. *Mason v. Am. Tobacco Co.,* 346 F.3d 36, 39 (2d Cir.2003). ATI does not allege that principals of DLJ held a gun to anyone's head. An investment bank and financial advisor cannot "require" or "mandate" that its client do anything; it can only advise and recommend. ATI bears responsibility for its own actions, whatever DLJ's purported advice.

**12.** The parameters of constitutional standing remain the exclusive province of federal law. But federal law, with certain statutorily enumerated exceptions, authorizes trustees to bring only those actions that the debtor "could have brought prior to the bankruptcy proceedings," *Hirsch,* 72 F.3d at 1093, and the debtor's rights depend on state law. *Id.* While the injury-in-fact inquiry therefore remains a question of federal law, whether the rights asserted "belong to the debtor or the individual creditors is a question of state law." *St. Paul Fire & Marine Ins. Co. v. PepsiCo., Inc.,* 884 F.2d 688, 700 (2d Cir. 1989); *see also Wight,* 219 F.3d at 86.

Second, the complaint suggests that the ATI/MATI/SATI structure injured ATI because the $20 million "debt had to be repaid somehow" (Compl.¶ 49), and therefore, ATI, allegedly at DLJ's command, created a "mechanism to repay the Elghanayan debt and filter money out to the ATI shareholders, Elghanayan and Gabayzadeh, and to store up money for paying off DLJ on the DLJ Loan and Warrants." (*Id.*) "To accomplish this," the complaint continues, "DLJ acquiesced in SATI entering into capital equipment leases," whereby SATI "sublease[d] the equipment to ATI on grossly above market payment terms." (*Id.* ¶ 50.)

At the threshold, it is far from clear that a corporation can state a claim against a financial adviser for "acquiesc[ing] in" unfavorable financial arrangements. But to remain focused for the nonce on standing—that is, whether ATI suffered an injury-in-fact because of DLJ's advice to create a certain corporate structure—insofar as that advice harmed ATI, it is not because of the corporate structure recommended by DLJ; rather, it is because—again, by the complaint's own allegations—SATI subleased equipment to ATI on "grossly unfair" terms.[13] The sublease, not DLJ's advice, injured ATI. ATI therefore fails, on this theory too, to allege an injury to itself caused by DLJ's advice to create the SATI/MATI/ATI corporate structure. Whether ATI can state a claim based on DLJ's "acquiesc[ence] in" ATI's sublease of equipment from SATI on unfavorable terms will be analyzed in the appropriate context below.

### c. *Equity Infusion*

■ ATI also lacks standing to assert claims arising out of DLJ's alleged last-minute decision, "contrary to all prior representations," that to make the bond offering attractive to investors, ATI would need to secure a $25 million equity infusion. Again, assuming, as the complaint alleges, that DLJ repeatedly assured ATI that the bond offering could be accomplished without an equity infusion, DLJ's eleventh-hour determination that a $25 million equity infusion would be required did not injure ATI. The complaint suggests that it injured ATI because ATI needed to acquire the equity on very short notice. (Compl.¶ 35.) DLJ thereby put itself in a position effectively to coerce MATI into accepting a $20 million loan on terms dictated by DLJ, which money would, in turn, be contributed to ATI, and moreover, "required that either SATI or MATI … make a $5 million equity contribution to ATI, which loan was funded by Elghanayan." (*Id.* ¶ 37; *see also id.* ¶ 44.)

But while these unanticipated and allegedly unfavorable loans conceivably injured ATI, the equity infusion itself certainly did not. To the contrary, ATI benefited; it gained $25 million in equity. Under no theory can that be characterized as an injury to ATI.[14] Hence, insofar as ATI

---

13. In the insider complaint filed by ATI against, among others, Elghanayan, ATI makes a similar claim: that after diverting corporate funds and thereby leaving ATI undercapitalized and unable to purchase equipment needed for its operations, Elghanayan leased the equipment to ATI "at considerable profit" in breach of his fiduciary duty to ATI. (Keats Decl., Ex. 13 ¶ 73.)

14. More broadly, DLJ argues that none of the alleged eleventh-hour changes to the bond

offering confer standing on ATI because all of them were financially favorable. (D. Br. 3, 21; D. Reply Br. 9–10.) According to the complaint, on July 2, 1999, one week before the scheduled closing of the transaction, DLJ not only told ATI that a $25 million equity infusion would be required, but that "the Bond due date was being moved up and [the] interest rate increased by 1%." (Compl.¶ 35.) Rather than proposing to raise $185 million at an 11.5% interest rate, DLJ proposed to

seeks to predicate the malpractice claims on an unanticipated equity infusion, it lacks standing.

#### d. Insertion of False Financial Information into the Prospectus

■ Finally, ATI lacks standing to assert claims arising out of DLJ's alleged insertion of false financial projections into the bond offering prospectus. ATI alleges that Crown's management cautioned DLJ that its financial projections for Crown were unrealistic, but DLJ used "the false projections anyway in the prospectus." (Compl. ¶ 33.) ATI "had no knowledge of these facts as they were occurring and did not learn of them until after the filing of its petition for bankruptcy." (*Id.*)

The inclusion of misleading financial projections in ATI's prospectus did not injure ATI; it injured ATI's investors, who presumably purchased the bonds based on incorrect or misleading information.[15] *See Hirsch,* 72 F.3d at 1094 (holding that "claims predicated upon the distribution of

misleading [private placement memoranda]" belong to the investors, "and may be asserted only by them and to the exclusion of [the trustee]").

The remaining sources of injury enumerated above, while diverse, allege fraud in various guises. Each boils down to an allegation that DLJ, with intent to defraud, concealed information from or manipulated ATI to enable DLJ to self-deal. While several of these alleged sources of injury either run afoul of the *Wagoner* rule or fail to give rise to a cognizable claim for reasons that will be considered below, they allege injury to ATI as distinct from its investors or creditors, vesting ATI with Article III standing to bring them.

#### 2. The Wagoner Rule

■ DLJ argues that even if ATI has Article III standing to bring certain claims, the *Wagoner* rule bars them because ATI's management allegedly participated in the very wrongful conduct for which ATI seeks to recover. *See Wagon-*

---

raise $165 million at a 12.5% interest rate. (*Id.* ¶ 36.) DLJ also advanced the due date of the bonds by three years. (*Id.*) DLJ observes that these changes, far from injuring ATI, helped it, for "an elementary mathematical calculation demonstrates that the difference between $185 million at 11.5% and $165 million at 12.5% resulted in a net annual *savings* to ATI of $650,000. Moreover, ... [DLJ] raised *$190 million* in total for ATI (not just $165 million), of which $25 million was not subject to debt service requirements." (D. Br. 3; *see also* D. Reply Br. 9–10.) These observations cast further doubt on ATI's claim that DLJ's last-minute changes to the bond offering proximately caused its bankruptcy, or indeed, injured it at all. Still, that the modified terms appear facially more favorable in the short term does not divest ATI of standing to assert that DLJ breached its obligation to structure the deal as it promised; it only calls into question what damages ATI incurred because of this alleged breach. Conceivably, the modified terms of the bond offering adversely affected ATI's market standing, or per-

haps those changes, while facially more favorable, could be shown not to be under some more sophisticated and long-term analysis. A $25 million equity infusion, by contrast, simply cannot, under any legal theory, be deemed an injury-in-fact to a corporation.

15. ATI does not allege that the false information in the prospectus caused it reputational damage or any other injury that conceivably harmed the corporation as distinct from its investors. Moreover, ATI explicitly represented the truth of the information contained in the offering memoranda. (Keats Decl., Ex. 10 at 10, 19.) Claims based on misleading information in the prospectus would therefore also be barred by the *Wagoner* rule. *See Wight*, 219 F.3d at 87 ("Because management's misconduct is imputed to the corporation, and because the trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in.").

*er,* 944 F.2d at 118; *Am. Tissue,* 275 F.Supp.2d at 404. *Wagoner* expresses a rule of New York law "derive[d] from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Wight,* 219 F.3d at 86. "Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Id.* at 87. This rule applies to a debtor-in-possession, *Am. Tissue,* 275 F.Supp.2d at 404 n. 6, that alleges malpractice claims. *In re Bennett,* 336 F.3d at 100.

The parties vigorously dispute whether *Wagoner* applies here.[16] DLJ introduces evidence in an effort to establish that ATI's sole shareholders, Gabayzadeh and Elghanayan, participated in the very fraudulent, indeed allegedly criminal, conduct on which ATI predicates the malpractice claims. This evidence includes ATI's insider complaint against, among others, Gabayzadeh and Elghanayan (Keats Decl., Ex. 13), a federal indictment of, among others, Gabayzadeh and SATI, (*id.,* Ex. 14), and an SEC complaint against, among others, Gabayzadeh and ATI. (*Id.,* Ex. 15.) As summarized by Judge Scheindlin in an action brought by ATI against its former accountant,

> the essence of the Insider Complaint is that Gabayzadeh and Elghanayan "participated in and allowed various financial improprieties to take place".... Ultimately, Gabayzadeh and Elghanayan's "action and inaction caused the artificial perpetuation of [ATI's] existence past the point of insolvency," making bankruptcy a foregone conclusion.... [T]he gravamen of the Insider Complaint is that Gabayzadeh and Elghanayan "misused their control" of ATI, and that Gabayzadeh "actively participated" in accounting irregularities and the manipulation of ATI's financials....

*Am. Tissue,* 275 F.Supp.2d at 402 (internal citations to insider complaint omitted). The federal indictment and SEC complaint allege, among other things, bank and securities fraud. *Id.* at 403.

 ATI concedes that on a Rule 12(b)(1) motion, where, as here, "evidence relevant to the jurisdictional question is before the court, 'the district court ... may refer to [that] evidence.' " *Robinson v. Gov't of Malaysia,* 269 F.3d 133, 140 (2d

---

16. ATI argues that New York's comparative negligence statute, N.Y. C.P.L.R. §§ 1411–12, overruled *Wagoner.* (P. Br.17–23.) Judge Scheindlin correctly characterized this argument as a misapprehension of *Wagoner. See Am. Tissue Inc. v. Arthur Andersen, L.L.P.,* No. 02 Civ. 7751, 2003 WL 22909155, at *3–4 (S.D.N.Y. Dec. 9, 2003) (*"American Tissue II"*). In *American Tissue II,* the court explained that

> [t]he *Wagoner* rule is a *standing* rule—it says that a bankrupt corporation cannot sue a third party for fraud that the corporation itself participated in because that claim actually accrues to the corporation's creditors. The comparative fault rule is a *damages* rule—it says that a defendant may be liable for conduct even though the plaintiff herself was also at fault; the defendant's

liability is simply limited to that percentage of the damages that she is responsible for. *Id.* at 2003 WL 22909155 *4. The two rules therefore do not conflict. *Wagoner* circumscribes the universe of parties that can sue, while the comparative negligence statute governs how damages shall be apportioned if two or more parties—for instance, a company and its accountant—share liability for a tort such as financial fraud. *See id.* In any event, as the Court emphasized at oral argument (Tr. 22–26), the Second Circuit, which "certainly had the New York comparative negligence statute in front of" it in *Wagoner* and its progeny (*id.* 25). affirmed *Wagoner* as recently as last year. *See In re Bennett,* 336 F.3d at 99–100. Needless to say, the Court cannot overrule the Second Circuit, even if it agreed with ATI, which it does not.

Cir.2001), quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000); *see also Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir.1986). (P. Br.11.) ATI objects, however, to reliance on the insider complaint, the federal indictment, and the SEC complaint because each consists merely of allegations, not proof of those allegations.[17] (P. Br. 23–25; Tr. 28–29.)

■■■■ Because charging documents prepared by the U.S. Attorney's Office or the SEC do not constitute proof of the facts they allege, ATI is correct that it would be improper to accept as true the factual allegations in these documents for purposes of applying *Wagoner*. Conceptually, ATI's insider complaint stands on a different footing, for it consists of allegations made *by* ATI, and "[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound." *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir.1985); *see also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003). At the same time, while research discloses no Second Circuit authority on point, the general rule seems to be that a judicial admission only binds the party that makes it in the action in which it is made, not "in separate and subsequent cases." *State Farm Mut. Auto. Ins. Co. v. Worthington*, 405 F.2d 683, 686 (8th Cir. 1968); *accord, Universal Am. Barge Corp. v. J–Chem, Inc.*, 946 F.2d 1131, 1142 (5th Cir.1991). The Court will therefore eschew reliance on the insider complaint, indictment, and SEC complaint for purposes of applying the *Wagoner* rule to the allegations in ATI's complaint in this action.[18]

In any event, at oral argument, DLJ appeared to argue that the Court need not look to any extrinsic evidence because ATI's allegations alone establish the applicability of *Wagoner*. DLJ's reply brief also suggests that, based on the complaint alone, ATI lacks standing under *Wagoner* to bring the malpractice claims. (D. Reply Br. 5–6.) Specifically, DLJ argues that the complaint itself belies ATI's assertion that the alleged wrongdoings of its controlling shareholders occurred two years after the events giving rise to this action; rather, the complaint, DLJ contends, "alleges a two-year continuing fraud on creditors by

---

**17.** ATI also objects that DLJ introduces these charging documents through the affidavit of a lawyer who lacks personal knowledge. (P. Br. 24–25; Tr. 29.) This objection, at least insofar as it concerns public documents, is misplaced. The Court can take judicial notice of matters of public record, *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998), including filings in related lawsuits, *e.g., Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000), albeit "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992) (summary judgment decision).

**18.** ATI also objects that the fraudulent conduct for which it sued its shareholders oc-

curred some two years after the events giving rise to this action against DLJ. (P. Br.2.) The Court need not decide issues of chronology because it places no reliance on extrinsic charging documents in applying the *Wagoner* rule. The analysis in the text rests solely on ATI's allegations in this case. The facts in any event remain insufficiently clear at this juncture to permit the Court to find that all of ATI's allegations, at bottom, concern one overarching fraud for which its management also bears liability. This may turn out to be true, but on a motion to dismiss, the Court must assume the truth of the factual allegations in the complaint, viewing the evidence in the light most favorable to the non-moving party and drawing all inferences in its favor. *Leeds*, 85 F.3d at 53.

ATI hand-in-glove with DLJSC." (D. Reply Br. 5.)

ATI's oblique allegations make it difficult to apply. *Wagoner.* The complaint seldom explicitly acknowledges the nature and extent of ATI's participation in the allegedly wrongful acts that DLJ variously "demanded" (Compl.¶ 44), "required" (*id.* ¶¶ 37, 39, 48), "imposed" (*id.* ¶ 43) or "acquiesced in." (*Id.* ¶ 50.) ATI, as the complaint tells it, "succumbed to DLJ's mandates" with its "back ... against the wall in financial duress." (*Id.* ¶ 44.) [19] In the final analysis, however, this rhetoric, *see* note 11 above, can neither conceal ATI's participation in the acts for which it seeks to hold DLJ liable nor prevent the Court from drawing inferences compelled by the narrative set forth, however obliquely, in the complaint—for it is implicit in the complaint that what DLJ "demanded" or "required," ATI *did.*

■ Many of ATI's allegations, as DLJ rightly points out, in essence accuse DLJ of failing to disclose material facts to the detriment of ATI's investors and creditors. (D. Reply Br. 5.) Even if DLJ's alleged concealment injured ATI, vesting it with constitutional standing, insofar as ATI participated in or ratified this deception, the *Wagoner* rule bars its claims against DLJ. Scrutiny of the allegations reveals that this is indeed the case, for ATI *alleges* that it participated in, or at a minimum concealed, some of the very acts of fraud upon its creditors for which it now sues DLJ. In particular, under *Wagoner,* ATI lacks standing to assert claims arising out of at least two of the alleged sources of injury enumerated above: that DLJ devised a corporate structure to conceal the existence of $20 million in shareholder debt

from prospective investors in the bond offering, *see* note 10 above, and that it "acquiesced in" an equipment sublease that guaranteed that ATI would pay DLJ for certain loans rather than "servicing debt and paying creditors." (Compl.¶¶ 50, 56.)

ATI alleges that DLJ established a "mechanism to repay the Elghanayan debt and filter money out to the ATI shareholders ..., to store up money for paying off DLJ on the DLJ Loan and Warrants, without the current Bondholders and LaSalle [a principal creditor] knowing about it." (Compl.¶ 49.) In particular, ATI alleges that at the time of the bond offering, ATI offered its investors "security interests" in certain equipment "necessary for the operation of ATI and its subsidiaries," but immediately thereafter, engaged in a transaction whereby ATI transferred ownership of the equipment to SATI, which leased it back to ATI "on grossly above market payment terms," depriving ATI's bond holders of a "security interest in equipment in which they thought they were secured." (*Id.* ¶ 50.) DLJ allegedly "acquiesced in" this arrangement. (*Id.*)

Under *Wagoner,* ATI lacks standing to assert malpractice claims arising from this source of injury. By the complaint's own allegations, ATI entered into an arrangement that deprived its bond holders of a security interest that it promised them. Even if DLJ advised ATI to enter into this arrangement—or, as the complaint says, "acquiesced in" it—ATI participated in the very wrong for which it seeks to hold DLJ liable. *ATI* entered into the sale-leaseback transaction that deprived investors of a security interest in the equipment. Unmasking SATI and MATI makes the nature and extent of ATI's role in this trans-

---

**19.** ATI sought to convey a similar impression at oral argument, characterizing its erstwhile shareholders, Gabayzadeh and Elghanayan, as "late middle-aged gentlemen that don't have the sophistication ... in high finance," and who therefore unquestioningly agreed to whatever DLJ proposed. (Tr. 19.)

action even more glaring. Recall that (1) SATI was no more than a corporate vehicle that wholly owned MATI, which, in turn, wholly owned ATI; and (2) Elghanayan and Gabayzadeh, the erstwhile shareholders and officers of ATI's predecessor, Holdings, owned SATI, the parent of MATI, in equal shares. (Compl.¶ 32.) Effectively, then, ATI alleges that, with DLJ's "acquiesc[ence]," it entered into a sale-leaseback agreement with SATI, a corporate entity wholly owned by its own shareholders,[20] which not only deprived its investors of "a security interest," but also "forced [ATI] to significantly overpay for leased equipment which detracted from its cash flow, and therefore, its ability to operate, which directly led to its bankruptcy." (*Id.* ¶ 50.). That is to say, ATI's own shareholders, in the guise of SATI, imposed a usurious loan on ATI that deprived investors of a security interest and "led to its bankruptcy." The *Wagoner* rule therefore divests ATI of standing to assert claims arising out of the equipment sale-leaseback transaction and related loan. *See In re Bennett,* 336 F.3d at 100. ("Even if there is damage to the corporation itself, the trustee cannot recover if the malfeasor was the corporation's sole shareholder and decision maker.")

### 3. *Conclusion*

In sum, ATI lacks standing, either under Article III, the *Wagoner* rule, or both, to bring claims insofar as it seeks to recover for injuries arising from (1) DLJ's advice to create a certain corporate structure in connection with the acquisition of Crown's assets, bond offering, and debt refinancing, (2) an unanticipated equity in-

fusion, (3) the promulgation of false information in the prospectus for the offering, and (4) the equipment sale-leaseback transaction. The malpractice claims survive to the extent that ATI predicates them on DLJ's alleged (1) fraudulent assurance about how the bond offering could and would be structured, (2) last-minute changes to the terms of the bond offering contrary to those assurances, and (3) premeditated machinations by which it injected itself into ATI's management to enable it to self-deal. These acts, at least conceptually, injured ATI itself, as distinct from its creditors, by placing ATI in a position in which it had no practical choice but to assume various unfavorable financial arrangements. Insofar as ATI seeks to recover for such injuries—for example, interest on a loan that allegedly would not have been required had DLJ acted in accordance with its fiduciary and contractual duties, and done what it promised ATI it would do—ATI has Article III standing. Equally, because ATI's management did not, so far as the complaint alleges, participate in DLJ's alleged fraud and self-dealing, the *Wagoner* rule also does not divest ATI of standing to assert such claims.

### B. *Exculpatory Clauses*

DLJ raises a second global objection to the malpractice claims. The Engagement Letter and the Highly Confident Letter incorporate provisions by which ATI agrees to indemnify DLJ and its affiliates and employees for liabilities "caused by, or arising out of or in connection with advice or services rendered" by DLJ in connection with the subject matter of those letters. DLJ argues that these indemnifica-

---

**20.** Technically, ATI's sole shareholder was MATI, which was wholly owned by SATI, which was wholly owned by Elghanayan and Gabayzadeh. But effectively, ATI alleges that its principals, whatever their formal position relative to ATI after the corporate restructur-

ing, "imposed" the loan about which it complains. ATI, in any event, accepted that loan, which is all that matters for purposes of *Wagoner,* for that loan deprived ATI's investors of the security interest that ATI had promised them as part of the bond offering.

tion provisions bar the malpractice claims "because the claims arise from ATI's overarching allegations that DLJSC 'provid[ed] negligent and wrong advice' and failed to comply with 'common law and professional standards for underwriters and financial advisors.'" (D. Br. 23 (quoting Compl. ¶¶ 61, 68).) DLJ cites *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Secs. Corp.*, No. 00 Civ. 8688, 2002 WL 362794, at *15–*16 (S.D.N.Y. Mar. 6, 2002), which dismissed similar claims against DLJ in another lawsuit on the ground that New York law deems enforceable exculpatory provisions relieving a party of liability for ordinary negligence.

 But the indemnification provisions do not exculpate DLJ for "gross negligence or willful misconduct." (Keats Decl., Ex. 1, Schedule I; Ex. 2, Schedule I; Ex. 3 at DLJ–0003.) Nor could they. New York law would deem such provisions void as against public policy. *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384–86, 461 N.Y.S.2d 746, 448 N.E.2d 413 (1983); *Aphrodite Jewelry, Inc. v. D & W Cent. Station Alarm Co.*, 256 A.D.2d 288, 681 N.Y.S.2d 305, 306–07 (2d Dep't 1998). Because ATI predicates its entire complaint on allegations of fraud, willful misconduct, and deception, and the Court must assume the truth of those allegations for purposes of a motion to dismiss, the indemnification provisions alone cannot shield DLJ from ATI's malpractice claims. But to the extent that ATI alleges mere negligence, as opposed to reckless, willful or fraudulent misconduct, the provisions operate to bar ATI's claims as a

matter of law. *See Donaldson, Lufkin & Jenrette Secs. Corp.*, 2002 WL 362794, at *16.

### C. Analysis of the Individual Claims

The malpractice claims, as noted above, survive to the extent that ATI predicates them on DLJ's alleged (1) fraudulent assurances about the bond offering, (2) last-minute changes to the terms of that offering contrary to those assurances, and (3) premeditated machinations by which DLJ injected itself into ATI's management to enable it to self-deal.

### 1. Professional Malpractice

Court I alleges professional malpractice.[21] ATI avers that DLJ owed it duties "under common law and professional standards for underwriters and financial advisers." (Compl.¶ 61.) DLJ allegedly breached that duty by (1) "lying to ATI at the outset of their relationship about the fact that equity would not have to be infused into the Transaction in order to make it succeed, when [it] knew otherwise" (*id.* ¶ 62); (2) "structuring the Transaction so that it was virtually impossible for ATI to meet its obligations under the Bond Offering" (*id.* ¶ 63); (3) "allowing a prospectus and financial statements that it knew were materially false and misleading to be publicly disseminated"; (4) "providing negligent and wrong advice" (*id.* ¶ 68); and (5) self-dealing through manipulation of ATI's management. (*Id.* ¶ 69.)

This claim will be dismissed. First, insofar as ATI predicates this claim on

---

**21.** DLJ questions whether such a claim even exists as against a financial adviser. (D.Br.24.) While it may be true, as DLJ represents, that no precedent in the Second Circuit "hold[s] that a financial adviser is subject to malpractice liability" (*id.*), malpractice is simply a species of negligence. *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir.2000) ("Under New York law, professional malpractice is a species of negligence.") (internal quotation marks and brackets omitted). There is no reason why financial advisers, unlike lawyers, doctors, and accountants, should be exempt from liability for negligent performance of their professional duties.

DLJ's last-minute decision that equity would be required to make the bond offering attractive to investors, it lacks standing. The equity infusion, as explained above, did not harm ATI. (To the extent that ATI means to emphasize DLJ's purported lies about this issue, it is really asserting a claim that DLJ engaged in fraud and self-dealing, allegations that will be considered separately.)

■ Second, insofar as ATI predicates the professional malpractice claim on DLJ's deficient structuring of the transaction, which, according to ATI, made it impossible for ATI to satisfy its debts, ATI (1) lacks standing, because ATI's inability to satisfy those debts harms its creditors, not ATI; (2) alleges only negligence, which the exculpatory clauses of the Engagement Letter and the Highly Confident Letter bar; and (3) fails to plead damages, because the complaint does not specify what damages *ATI* suffered as a consequence of the modified terms of the transaction. *See Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir.2000) (describing the elements of a professional malpractice claim under New York law as "(1) negligence, (2) which is the proximate cause of (3) damages") (internal quotation marks omitted). Indeed, at least on their face, the changes that DLJ purportedly sprung on ATI at the last moment, far from harming ATI, benefited it. ATI alleges that DLJ promised to raise $185 million in bonds with an interest rate of 11.5%; instead, it raised $190 million, comprised of a bond offering of $165 million with a 12.5% interest rate and $25 million in equity. (Compl.¶¶ 35–36.) That aggregate amount, as DLJ emphasizes, is $5 million *more* than ATI pleads "was the necessary and appropriate sum of cash for its needs while still being attractive to investors." (*Id.* ¶ 36; *see* D. Br. 13; D. Reply Br. 9.) The complaint itself thus belies ATI's particular allegation that DLJ's last-minute changes to the bond offering "meant ATI would get $20 million less than expected and needed." (Compl.¶ 36.) Moreover, as DLJ notes, "an elementary mathematical calculation demonstrates that the difference between $185 million at 11.5% and $165 million at 12.5% resulted in a net annual *savings* to ATI of $650,000." (D. Br. 3; *see also* D. Reply Br. 9–10.) The complaint itself thus also belies ATI's particular allegation that the last-minute changes to the terms of the offering increased ATI's debt service requirements. (Compl.¶ 36.) If ATI suffered damages because of DLJ's alleged last-minute restructuring of the transaction, the complaint does not plead them.

Third, insofar as ATI predicates the professional malpractice claim on DLJ's creation and dissemination of a false prospectus, ATI lacks standing. Such claims, for the reasons explained above, accrue exclusively to ATI's creditors.

Fourth, insofar as ATI predicates this claim on the provision of "negligent and wrongful advice," it is barred by the unambiguous terms of the exculpatory clauses of the Engagement and Highly Confident Letters. *See Official Comm. of Unsecured Creditors*, 2002 WL 362794, at *15.

■ That leaves, as the sole available predicate for the professional malpractice claim, ATI's generic allegations of self-dealing. ATI alleges that

DLJ manipulated various transactions, such as the equipment leases to be filtered upstream to SATI to assure a structure where DLJ would get paid its loan and Warrants to the detriment of ATI and its creditors, which caused a domino effect of leading to ATI's failure, and which then proximately caused the damage claimed herein.

(Compl.¶ 69.) This is not an allegation of mere negligence, but of deliberate manipulation and fraud. The exculpatory clauses therefore cannot shield DLJ from liability for such conduct. But Fed.R.Civ.P. 9(b) requires that "averments of fraud or mistake ... be stated with particularity." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). ATI offers absolutely no details to explain how DLJ defrauded or manipulated it, except to allege that DLJ lied to ATI from the outset and delayed proposing the restructured bond offering so as to put ATI in a vulnerable position, subject to financial pressure such that ATI, lest it go bankrupt, would have no choice but to accept certain allegedly usurious financial arrangements dictated by DLJ. (Compl.¶ 45.) But the complaint fails entirely to specify the "time, place, speaker, and content of the alleged misrepresentations." *Id.* at 1247; *see also Stern v. Gen. Elec. Co.,* 924 F.2d 472, 476 (2d Cir.1991) ("[A]llegations of fraud must be supported by particular statements indicating the factual circumstances on which the theory of fraud is based").

Accordingly, ATI fails to state a claim for professional malpractice.

### 2. *Breach of Contract*

Count II alleges breach of a contract, which ATI defines as the Engagement Letter, "as supported by the Confidentiality Agreement and the Highly Confident Letter." (Compl.¶ 73.) Under this rubric, ATI reiterates its allegations about DLJ's last-minute restructuring of the bond offering, failure to disclose that equity would be required, and alleged promulgation of a false and misleading prospectus.[22] (*Id.*

¶¶ 75, 77.) The latter claim, again, belongs to ATI's creditors, not to ATI, and therefore fails for want of standing. The former two claims likewise fail for the same reasons set forth in the preceding subsection, and one other: The various letters that ATI describes as the contract explicitly contradict ATI's allegations.

■■ By the Engagement Letter, ATI expressly acknowledges that the 11.5% interest rate is a "current estimate" subject to change based on a variety of circumstances. (Keats Decl., Ex. 1 at 3.) The Highly Confident Letter, too, not only makes no affirmative representations about how DLJ would structure the transaction, it explicitly disclaims DLJ's obligation to do so, noting that the ultimate structure of the financing will perforce depend "on market conditions at the time of the sale or placement," and that "subsequent developments may affect [DLJ's] view." (Keats Decl., Ex. 3 at DLJ–0005 to DLJ–0006.) Neither letter says anything, still less offers guarantees, about the need or lack thereof for an equity infusion.

Insofar as ATI alleges that DLJ made oral representations contrary to or in addition to the terms of the Engagement and Highly Confident Letters (Compl.¶¶ 24, 35), it alleges fraud, and the complaint again fails to plead fraud with particularity. ATI does not specify who made such representations, when, where, or under what circumstances. Indeed, were the particular terms of the bond offering and DLJ's purported assurance that no equity infusion would be required truly as crucial as ATI alleges, it is difficult to fathom why ATI did not insist that they be made part of the various written agreements that it collectively refers to as the contract.

---

22. ATI also alleges that "DLJ breached its contract with ATI by placing its own interests over those of ATI, thereby engaging in serious and damaging conflicts of interest." (Compl.¶ 76.) This is simply the abstract allegation of self-dealing repackaged as a contract claim. It adds nothing to the substance of the three malpractice claims, which is dealt with in the text.

Accordingly, ATI's claim for breach of contract will be dismissed.

### 3. Breach of Fiduciary Duty

 ATI's final malpractice claim alleges breach of fiduciary duty. DLJ contends that under New York law, an investment bank acting as a financial advisor can be a fiduciary *"only"* if it has been "retained to act as the client's agent, with the power to bind its principal." (D. Br. 29; *see also* D. Reply Br. 10–11.) None of the cases cited by DLJ sustain this proposition. A fiduciary duty arises under New York law wherever "one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold Brown & Co.*, 947 F.2d 595, 599 (2d Cir.1991) (internal quotation marks and brackets omitted); *see also United States v. Chestman*, 947 F.2d 551, 568 (observing that under New York law, a fiduciary duty arises if "confidence is reposed on one side and there is resulting superiority and influence on the other") (internal quotation marks omitted). In *Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900 (2d Dep't 1976), the Appellate Division aptly explained the flexible standard embraced by New York law:

> Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another.

*Id.* at 904–905.

New York courts have found fiduciary relations between clients and investment banks where "there is either 'a confidence reposed which invests the person trusted with an advantage in treating the person so confiding,'" *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir.1993), quoting *Fisher v. Bishop*, 108 N.Y. 25, 28, 15 N.E. 331 (1888), "or an assumption of control and responsibility." *Id.*; *see also BNY Capital Markets, Inc. v. Moltech Corp.*, No. 99 Civ. 11754, 2001 WL 262675, at *7 (S.D.N.Y. Mar. 14, 2001); *Fyrdman & Co. v. Credit Suisse First Boston Corp.*, 272 A.D.2d 236, 708 N.Y.S.2d 77, 79 (1st Dep't 2000); *Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 672 N.Y.S.2d 8, 14 (1st Dep't 1998); *Broadway Nat'l Bank v. Barton–Russell Corp.*, 154 Misc.2d 181, 585 N.Y.S.2d 933, 944–45 (1992). New York law therefore does not, contrary to DLJ's contention, make the presence of a fiduciary duty between a bank and its client contingent on a formal agency relationship of some kind.

ATI's complaint repeatedly emphasizes the extent of DLJ's penetration of ATI's finances and management, the extraordinary trust it reposed in DLJ, and its reliance on DLJ's advice and due diligence in connection with the bond offering and related transactions. (Compl.¶¶ 30, 40, 42–43, 52–53, 81–85, 88–89.) As in *Penato*, "[u]nder the facts alleged herein it is impossible to say that plaintiff will be unable to prove the existence of a fiduciary relationship." 383 N.Y.S.2d at 905. Assuming the truth of the allegations, DLJ owed a fiduciary duty to ATI in its capacities as investment banker and financial advisor. *See Wiener*, 672 N.Y.S.2d at 14 (whether a fiduciary duty "exists is necessarily fact-specific to the particular case").

How, if at all, DLJ breached that duty, according to the complaint's allegations,

presents a far more difficult question. The sole paragraph of Count III devoted to explaining DLJ's breach says only that

DLJ and Rush breached their fiduciary duties to ATI: (a) not just by engaging in conflicts of interest to ATI's detriment, (b) but by doing so in a gross and systematic manner, virtually since the inception of the DLJ and ATI relationship, and (c) by acting in their own self-interest and with gross, willful and wanton disregard for the fiduciary duties DLJ owed ATI.

(Compl.¶ 91.) Inflammatory adjectives cannot compensate for the absence of details explaining how DLJ "grossly, willfully, wantonly, and systematically" breached its fiduciary duties. Indeed, this paragraph, standing alone, might not meet even the liberal pleading requirements of Fed.R.Civ.P. 8, for it simply reiterates the cause of action; it does not give DLJ notice of what DLJ allegedly did to breach its fiduciary duties. Nevertheless, the complaint must be construed as a whole, *Yoder v. Orthomolecular Nutrition Institute Inc.*, 751 F.2d 555, 562 (2d Cir.1985), and it is axiomatic that a Rule 12(b)(6) motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99.

Returning, therefore, to the bases for the malpractice claims that survived DLJ's standing objections—that DLJ (1) gave ATI fraudulent assurances about the bond offering, (2) changed the terms of the offering at the last moment contrary to those assurances, and (3) injected itself into ATI's management to enable it to self-deal—it is clear that the gravamen of ATI's breach of fiduciary duty claim is that, rather than acting in ATI's interests, DLJ devised a complicated scheme by which it could profit from ATI's financial

duress. In particular, reading the complaint in the light most favorable to ATI, DLJ lied about the actual terms of the bond offering from the outset (Compl.¶ 36) so that ATI would be effectively compelled to enter into certain unfavorable financial arrangements designed, above all, to benefit DLJ. (*Id.* ¶ 44.)

Again, insofar as this claim alleges fraud—that DLJ deceived ATI about the terms of the offering to enable itself to self-deal—it fails to satisfy the pleading requirements of Fed.R.Civ.P. 9(b). But were the Court to grant ATI leave to replead to cure that defect, and assuming that ATI *could* then specify the "time, place, speaker, and content of the alleged misrepresentations," *DiVittorio*, 822 F.2d at 1247, ATI would likely be able to state a cognizable claim. ATI offers at least two specific theories about how DLJ engaged in self-dealing.

▮ The first, that DLJ engineered the sale-leaseback transaction to extort money from ATI, fails under *Wagoner* because ATI agreed to, and its erstwhile shareholders participated in, the very usurious sublease (which deprived ATI's investors of a promised security interest) about which ATI complains. The second, however, could state a claim. ATI alleges that when DLJ loaned $20 million to MATI, which would, in turn, be contributed to ATI as part of the $25 million equity infusion, it required MATI to give it "stock warrants equal to 10% of the issued and outstanding stock of MATI . . ., to be repurchased by ATI from DLJ for $12 million within about one year," thereby assuring itself "a 42% short-term return on its $20 million loan," as well as its underwriting and advisory fees on the bond offering. (Compl.¶ 38.) This $12 million, as well as DLJ's various fees, represent damages allegedly incurred by ATI as a consequence of DLJ's fraudulent acts and self-dealing.

Insofar as ATI's claim for breach of fiduciary duty rests on these allegations, it survives, and pursuant to Fed.R.Civ.P. 15(a), the Court will grant ATI limited leave to replead, as to this claim only, to give it an opportunity to satisfy the pleading standard of Rule 9(b). *See Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (holding that the district court abused its discretion by refusing to grant plaintiffs leave to replead where they "failed to plead fraud with the requisite particularity"); *Foman v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (emphasizing that "[i]t is ... contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of ... mere [pleading] technicalities").

Of course, granting ATI leave to replead could conceivably also salvage the professional malpractice and breach of contract claims. But these claims, as noted above, are redundant; the malpractice claims in essence assert a single claim under three rubrics. It would be duplicative and needless to give ATI leave to replead all three malpractice claims, particularly because the only potentially viable component of all three claims is identical in each case. Simply stated, this is the allegation that DLJ lied to ATI to enable itself to self-deal. Breach of fiduciary duty most appropriately captures the nature of this allegation. DLJ's alleged deception did not violate any particular contractual provision, making breach of contract an awkward legal rubric, and insofar as professional malpractice generally implies negligence, not willful misconduct and fraud, that claim, too, would be an incongruous fit for the surviving allegations.

Accordingly, the malpractice claims will be dismissed, but ATI will be granted leave to replead with particularity insofar as it has standing and alleges a breach of fiduciary duty arising out of DLJ's alleged fraud and self-dealing.

### III. *Fraudulent Inducement*

Count IV of the complaint alleges fraudulent inducement: that DLJ lied to ATI about its proposal for the bond offering and related issues from the outset to induce ATI to retain DLJ, and that ATI relied on DLJ's false representations, which proximately caused it damages. (Compl.¶¶ 94–99.) Again, the gravamen of this claim is that DLJ knew from the inception of the parties' relationship that the bond offering could not be accomplished without an equity infusion, and that its terms would be restructured, but concealed this information from ATI because it wanted to be retained, and to facilitate its ability to self-deal further down the road.[23] (Compl.¶¶ 24, 45, 94.)

The complaint again offers no details to satisfy Fed.R.Civ.P. 9(b). It does not specify the "time, place, speaker, and content of the alleged misrepresentations." *DiVittorio*, 822 F.2d at 1247; *see also Stern*, 924 F.2d at 476. Furthermore, the fraudulent inducement claim does not, as it must to state a claim, plead *facts* giving rise to a strong inference of scienter. *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990) (collecting cases).

 While the law recognizes that a plaintiff seldom will be able to acquire direct evidence of a defendant's culpable mental state, it must plead "circumstances

---

**23.** DLJ is correct that the mere allegation of a defendant's motivation to obtain business for itself does not suffice to plead scienter. *See ICD Holdings S.A. v. Frankel*, 976 F.Supp. 234, 245 n. 51 (S.D.N.Y.1997). But ATI alleges that DLJ misrepresented facts, not merely to ensure that ATI would retain DLJ as opposed to some other investment bank, but to manipulate itself into a position of strength from which to self-deal.

that provide at least a minimal factual basis for ... conclusory allegations of scienter." *Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994) (internal quotation marks omitted). Facts giving rise to an inference of scienter may be alleged on information and belief only if they lie "peculiarly within the opposing party's knowledge." *Wexner,* 902 F.2d at 172. That is not the case here. ATI explicitly alleges that (1) during the parties' initial negotiations and throughout their business relationship, "DLJ constantly and consistently assured [ATI] that the anticipated bond offering could be marketed successfully without any insider or third party equity contribution" (Compl. ¶ 24), and (2) "in conversations between DLJ and ATI immediately following DLJ's July 2, 1999 restructuring bombshell news, DLJ ... admitted that it consciously lied to ATI representatives at the inception of the parties['] relationship and then throughout the road show for the Bond Offering in order to get the engagement." (*Id.* ¶ 45.)

■ Hence, the facts giving rise to a strong inference of scienter do not lie peculiarly within DLJ's knowledge; to the contrary, ATI, according to its own allegations, should be able to plead facts about DLJ's alleged promises and concessions of fraud that would amply suffice to meet the standard prescribed by Rule 9(b). It has not. The fraudulent inducement claim will therefore be dismissed, but because the factual allegations that could cure this claim overlap substantially, if not identically, with those that could cure ATI's claim for breach of fiduciary duty, the Court will grant ATI leave to replead this claim with particularity as well.

## IV. *The Fraudulent Conveyance Claims*

Counts V through X allege fraudulent conveyances under the federal bankruptcy laws and pendent claims under the New York State Debtor and Creditor Law. All of these claims rest on the same factual allegations: Within one year of ATI's filing for bankruptcy on September 10, 2001, SATI paid $20 million to DLJ [24] to satisfy certain financial obligations arising out of the bond offering and related transactions, $14,850,096 of which actually belonged to ATI. (Compl. ¶¶ 102–104.) SATI nonetheless used ATI's assets to make these payments "with the actual intent to delay, hinder or defraud any entity to which ATI was or became, on or after the date of the transfers, indebted." (*Id.* ¶¶ 105–06.) (Count VI alleges constructive fraudulent conveyance based on the same set of facts.) DLJ lodges a number of objections to these claims.

### A. *"Reasonably Equivalent" or "Fair" Value*

First, DLJ argues that the constructive fraudulent conveyance claims, Counts VI and VIII, "fail because ATI received 'reasonably equivalent,'" 11 U.S.C. § 548(a)(1)(B)(i), or "fair," N.Y. Debt. & Cred. Law § 273, value in exchange for the allegedly fraudulent transfers, namely, the $25 million in equity contributed to ATI by SATI and MATI at the time of the bond offering. (D.Br.37.) But although that $25 million *"exceeds* the amount of the Payments" (*id.;* emphasis in original), ATI correctly observes that "whether a transfer is for 'reasonably equivalent value' is largely a question of fact," the determina-

---

**24.** The relevant DLJ entity, for these purposes, appears to be one or more of the DLJ Merchant Banking Partners ("DLJMB") entities. Because it does not affect the resolution of this motion, and because the complaint itself accords no significance to and often fails to distinguish between the various DLJ entities and affiliates, the Court will continue to refer to the singular "DLJ" as the defendant.

tion of which perforce "depends on all the circumstances surrounding . the transaction." *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 466 (S.D.N.Y.2001).

■■■ It would therefore be premature to dismiss the § 548(a)(1)(B) claim on the ground that the value transferred to ATI appears, in simple mathematical terms, to exceed that of the allegedly fraudulent transfers. The totality of the circumstances must be examined, and ATI has a right to offer evidence in an effort to show that, contrary to appearances, it did not receive "reasonably equivalent value in exchange for [the] transfer." 11 U.S.C. § 548(a)(1)(B)(i). *See Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir.1997) (noting that "the formula for determining reasonably equivalent value is not a fixed mathematical formula; rather, the standard for reasonable equivalence should depend on all the facts of each case," including "whether the sale was an arm's length transaction between a willing buyer and a willing seller") (internal quotation marks and alterations omitted); *accord, Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 466–67 (4th Cir.1990). Equally, whether ATI received "fair consideration" within the meaning of the analogous New York statute, N.Y. Debt. & Cred. Law § 273, depends on "the facts and circumstances of each particular case." *Sullivan v. Messer (In re Corcoran)*, 246 B.R. 152, 159 (E.D.N.Y.2000), quoting *United States v. McCombs*, 30 F.3d 310, 326 (2d Cir. 1994).

B. *Pleading with Particularity*

■■■ Second, DLJ argues that the actual fraudulent conveyance claims under federal and New York law, 11 U.S.C. § 548(a)(1)(A) and N.Y Debt. & Cred. Law § 276, respectively, fail because such claims must be pled with particularity pursuant to Fed.R.Civ.P. 9(b). *See Harrison III v. Entm't Equities, Inc. (In re Rave Communications, Inc.)*, 138 B.R. 390, 395–96 (Bkrtcy.S.D.N.Y.1992); · *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 497–98 (N.D.Ill.1988) (actual fraudulent conveyance under federal law); *In re Trace Int'l Holdings, Inc.*, 289 B.R. 548, 556–57 (Bkrtcy.S.D.N.Y.2003) (fraudulent conveyance under N.Y. Debt. & Cred. Law § 276).[25] ATI replies that it has pled that Rush, as a member of ATI's board of directors, "had actual knowledge that SATI and MATI had no business operations and were merely holding companies," that he and DLJ knew that SATI's funds belonged to ATI, as "the only entity generating money," and that because they also knew of ATI's impending bankruptcy, they effectuated the transfer to DLJ before the filing of ATI's petition. (P. Br. 36–37; *see* Compl. ¶ 57). While the complaint is far from a model of pleading, "[c]ourts usually evaluate averments of fraud more liberally in the bankruptcy context than in other civil actions." *Harrison III*, 138 B.R. at 395; *see also Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.)*, 32 B.R. 199, 203 (Bkrtcy.S.D.N.Y.1983) (stating

25. In its reply brief, DLJ, citing *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n. 5 (2d Cir.1995), argues that ATI's complaint fails to plead with particularity because *"scienter* must be plead [sic] with particularity *from the perspective of the transferor,* not from the perspective of the transferee."* (D. Reply Br. 14–15; emphasis in original.) That is correct. But ATI alleges that DLJ, through Rush's po-sition on the board of directors and otherwise, effectively exercised control over ATI such that its intent can be imputed to the debtor and transferor. While ATI will face an extremely high burden of proof to establish this level of managerial control, the allegations, however inartful, suffice to defeat a Rule 12(b)(6) motion.

that "greater liberality should be afforded in the pleading of fraud in a bankruptcy case"); *see also Wieboldt*, 94 B.R. at 498. ATI's complaint "describes the specific injury," "describes the legal theories upon which it bases its claims," and suffices "to allow each defendant to prepare an effective answer or defense." *Id.* Accordingly, the allegations pled in support of the federal and state claims for actual fraudulent conveyance suffice, if barely, to meet the requirements of Fed.R.Civ.P. 9(b).[26]

### C. Antecedent Debt

Third, DLJ argues that ATI cannot state a claim against DLJ for fraudulent conveyance because the transfers were made to satisfy an "antecedent debt," 11 U.S.C. § 550(b)(1), namely, the MATI stock warrants and loan. But § 550(b)(1) precludes recovery on this basis only if the transferee accepts the payments "in good faith, and without knowledge of the voidability of the transfer avoided." Assuming the truth of ATI's allegations, DLJ designed the structure of the various relevant transactions with fraudulent intent, that is, in bad faith; specifically, DLJ sought to ensure that ATI would pay it before satisfying debts to creditors. Contrary to DLJ's assertion that "the Complaint does not plead that DLJMB [the transferee] was aware that the Payments had been diverted from ATI customers," the complaint expressly alleges that Rush, a director of both ATI and DLJ, knew that the funds used to satisfy debts to SATI and MATI would be drawn from ATI (Compl.¶ 57), and DLJ describes Rush in its brief as "a representative of DLJMB." (D.Br.6.) DLJ's knowledge and good faith (or lack of it) at the time of the allegedly

voidable transfers is a question of fact for the jury.

### D. Settlement Payments

Finally, DLJ challenges the fraudulent conveyance claims on the ground that the monies paid by ATI were "settlement payments" within the meaning of 11 U.S.C. § 546(e), which may not be avoided if "made by or to a ... financial institution ... before the commencement of the case." *Id.* (D.Br.39–40.) According to DLJ, the transfers sought to be avoided were paid to a financial institution, DLJMB, "pursuant to the MATI Purchase Agreement, which is a 'securities contract' within the meaning of the Bankruptcy Code." (*Id.*)

First, it is unclear, as a factual matter, that the transfers qualify as "settlement payments." Courts consider several factors to determine whether payments fall within § 546(e), *see Jackson*, 263 B.R. at 479–80, and some of these cast doubt on DLJ's confident assertion that the payments at issue here unambiguously constitute "settlement payments." For instance, it is not clear that the "reversal of the [transfer at issue in this case] may result in disruption of the securities industry, creating a potential chain reaction that could threaten collapse of the affected market," *id.* at 479, or that "the transaction implicated participants in the system of intermediaries and guarantees which characterize the clearing and settlement process of public markets and therefore would create the potential for adverse impacts on the functioning of the securities market if any of those guarantees in the chain were invoked." *Id.* at 480.

**26.** DLJ also argues that Count VII, which seeks recovery for the fraudulent conveyances pursuant to 11 U.S.C. § 550(a), fails because the constructive and actual fraudulent conveyance claims that serve as the predicate for a § 550(a) claim must be dismissed. Because the Court has rejected DLJ's arguments for dismissal of the fraudulent conveyance claims, the basis for DLJ's objection to the § 550(a) count no longer exists.

Second, § 546(e) in any event explicitly carves out an exception for transfers covered by 11 U.S.C. § 548(a)(1)(A) (actual fraudulent conveyance), and the Court has already held that ATI has adequately alleged a claim for actual fraudulent conveyance under that section. Resolution of these issues must therefore await the taking of evidence to clarify both (1) whether the transfers constitute "settlement payments" within the meaning of § 546(e), *see Jackson,* 263 B.R. at 479–80, and (2) whether the exception for actual fraudulent conveyances applies.

Accordingly, DLJ's motion to dismiss the bankruptcy claims is denied.

### CONCLUSION

For the reasons set forth above, DLJ's motion to dismiss is granted as to Counts I, II, III, and IV of the complaint, except that ATI may replead Counts III (breach of fiduciary duty) and IV (fraudulent inducement) with particularity insofar as it has standing and predicates those claims on DLJ's alleged fraud and self-dealing; and DLJ's motion to dismiss is denied as to Counts V through X. Any amended complaint must be filed by August 27, 2004.

SO ORDERED.